Leo M. METCALF, Appellant,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Appellee.

No. 85–1798–WM.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1986.

Decided Sept. 12, 1986.

Peggy S. Hedrick, Springfield, Mo., for appellant.

Robin J. Aiken, Asst. U.S. Atty., Springfield, Mo., for appellee.

Before GIBSON and WOLLMAN, Circuit Judges, and HARPER,* Senior District Judge.

HARPER, Senior District Judge.

Leo M. Metcalf appeals from an order of the district court affirming the final decision of the Secretary of Health and Human Services denying his application for a period of disability and disability insurance benefits under Sections 216(i) and 223 of the Social Security Act (hereinafter Act), 42 U.S.C. §§ 416(i) and 423, and supplemental security income under Sections 1602 and 1614(a)(3)(A) of the Act, 42 U.S.C. §§ 1381a and 1382c(a)(3)(A). For reversal Metcalf contends that substantial evidence does not support the findings of the Administrative Law Judge (hereinafter ALJ) that, (1) he was not disabled due to alcoholism; and, (2) he is able to perform his past relevant work as a dishwasher despite the presence of a severe mental impairment. For the reasons discussed below, we affirm the decision of the district court.

Metcalf applied for a period of disability and disability insurance benefits on December 9, 1982 and supplemental security income on December 31, 1981, December 9, 1982 and April 29, 1983. His initial claims

---

* The HONORABLE ROY W. HARPER, Senior U.S. District Judge for the Eastern District of Missouri, sitting by designation.

and requests for reconsideration were denied. On May 1, 1984, a hearing was held at Metcalf's request. The ALJ determined that Metcalf was not entitled to disability benefits because his severe impairment did not preclude him from performing his past relevant work as a dishwasher. The Appeals Council upheld the ALJ's decision. Metcalf thereafter sought review before the district court pursuant to Section 205(g) of the Act, 42 U.S.C. § 405(g). The district court held that substantial evidence supported the ALJ's decision and granted summary judgment in favor of the Secretary. This appeal followed.

Metcalf's claims for disability benefits are predicated upon disability resulting from mental and physical impairments. Because Metcalf disputes only the ALJ's findings regarding his mental impairments, our discussion will be limited accordingly.

> "On appellate review, our duty, as is the district court's, is to evaluate all of the evidence on the record. In order to sustain the Secretary's decision there must exist substantial evidence appearing on the record as a whole. This standard of review is more than a search for the existence of substantial evidence supporting the Secretary's findings. As Justice Frankfurter made clear [in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 [71 S.Ct. 456, 464, 95 L.Ed. 456] (1951)] 'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"

*Brand v. Secretary of HEW*, 623 F.2d 523, 527 (8th Cir.1980).

■ Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Lewis v. Califano*, 574 F.2d 452, 455 (8th Cir. 1978). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). After carefully reviewing the ALJ's decision and the administrative record, we hold that the ALJ's findings were clearly supported by substantial evidence.

Metcalf met the disability insured status of Title II of the Act (20 CFR § 404.101 et seq. (1984)) on September 30, 1983, the date on which Metcalf alleges he became disabled and his insured status expired. In order to be entitled to a period of disability and disability insurance benefits, Metcalf must show that he became severely impaired on or before September 30, 1983 and that the severe impairment lasted, or is expected to last for a continuous period of at least twelve months. 20 CFR §§ 404.-131 and 404.1508. In order to be entitled to supplemental security income, Metcalf must show that he was severely impaired on April 29, 1983, the date on which he made his most recent application, or some date thereafter, and that the severe impairment lasted or is expected to last for a continuous period of at least twelve months. 20 CFR §§ 416.335 and 416.905.

The administrative record reveals that Metcalf was born May 5, 1940 and has an eighth grade education. He is single and lives alone. Throughout most of his life he has worked primarily as a dishwasher, his longest period of continuous employment being approximately two years. He has not been gainfully employed since March 17, 1982. He is supported by general relief, food stamps and charity. He also derives occasional income from selling aluminum cans, leather items and his own blood plasma. At the hearing, Metcalf claimed that he was attending a nurses aide training course for the past two months and maintaining a C-plus average.

The records reveal that Metcalf has a long history of mental difficulties. The nature of this appeal requires that we set out, in some detail, the evidence pertaining to Metcalf's mental status. Metcalf first received psychiatric evaluation on October 19, 1980. Dr. Jim Earls examined Metcalf

at the request of Metcalf's vocational counselor. It was Dr. Earl's opinion at that time that Metcalf's worst problem was his alcohol abuse.

On December 21, 1981, Metcalf was admitted to the psychiatric unit at Springfield Park Central Hospital to prevent him from acting upon suicidal impulses. Metcalf's live-in girlfriend had recently given up for adoption their illegitimate child, which caused Metcalf severe mental distress. Metcalf received individual psychotherapy and was discharged after one week in the hospital.

On January 21, 1982, Dr. Earls again evaluated Metcalf and diagnosed him as having a "mixed personality disorder with schizoid and passive aggressive traits." Dr. Earls opined that Metcalf's highest level of adaptive functioning during the previous year was "marginal," and that Metcalf is capable of handling funds in his own best interest.

Metcalf was taken to the emergency room at Lester E. Cox Medical Center on February 18, 1982, after taking thirty-five ampicillin tablets in an apparent suicide attempt. He was treated for the overdose and released from the emergency room under a friend's care.

Metcalf was hospitalized on May 21 and October 7, 1982, at St. John's Regional Health Center, for two and four weeks, respectively, complaining of anxiety and depression. During these hospitalizations, Metcalf received individual and group psychotherapy, milieu therapy and assertiveness training. His prognosis upon discharge was considered to be good.

Metcalf was again examined by Dr. Earls on January 10, January 24 and July 21, 1983. From these examinations, Dr. Earls concluded that Metcalf has "poor relationships with everyone * * * a limited ability to think and reason * * * and a limited attention span." In Dr. Earl's opinion, Metcalf is not psychotic; rather, he suffers from a "schizotypal personality disorder."

On June 1, 1983, the Missouri Division of Family Services (hereinafter MDFS) sent Metcalf to Bruce Davis, a licensed psychologist, for the purpose of ascertaining current intellectual levels and obtaining a limited psychological profile, including tests for organicity. Metcalf was administered the Wechsler Adult Intelligence Scale, which revealed a verbal IQ of 96 (average), a performance IQ of 80 (dull normal) and a full scale IQ of 89 (dull normal). Analysis of Metcalf's subscale performance suggested that Metcalf possesses "adequate judgment, likelihood of anxiety and/or tension of clinically significant magnitude, possible organic condition (right hemisphere dysfunctioning), possible aphasic condition, neurotic or inadequate personality with anxiety or hysteria, possible 'beat', homeless and downtrodden conditions."

Administration of the Memory for Designs test for brain damage yielded scores in the borderline range, and administration of the Bender Gestalt test also indicted moderate signs for organicity. From these tests results, Davis concluded that "there is a good case for a borderline organic brain syndrome [,however,] the level of deterioration would not meet the DSM–III requirements for an organic mental disorder at this time."

Other evidence pertaining to Metcalf's psychiatric condition appearing in the record includes the statements of Metcalf's caseworkers at MDFS and evaluation reports from Dr. Roy Wilson and Dr. Eugene Parkinson, consulting physicians. Lola Henderson, Metcalf's caseworker, states: "In my opinion, Mr. Metcalf fits in well with the definition of schizophrenia and psychosis * * *. He seems just able to cope from one minute to the next." Metcalf's other caseworker, Jan Henrickson, states: "In my opinion, Mr. Metcalf is not capable of functioning in society whether because of mental limitation or mental illness."

Dr. Wilson examined Metcalf on July 7, 1983, at the request of MDFS. He diagnosed Metcalf as having "schizo-affective disorder, depressed, passive-aggressive personality, very unstable." Metcalf's prognosis was said to be "very guarded."

796

On August 23, 1983, Dr. Parkinson performed a Residual Functioning Capacity Assessment at the request of MDFS. In Dr. Parkinson's opinion, Metcalf is limited to performing "simple, low-level stress jobs" as a result of his mental condition.

At the hearing, Dr. Grenfell, a vocational expert, testified regarding Metcalf's ability to engage in substantial gainful employment. Dr. Grenfell's opinion was based upon Metcalf's testimony, the evidence contained in the administrative record, Dr. Grenfell's familiarity with the Social Security regulations, and Dr. Grenfell's education, training and experience in vocational matters. In response to a hypothetical question posed by the ALJ,[1] Dr. Grenfell opined: "If [Metcalf's mixed personality with passive aggressive traits] is exacerbated and Metcalf has moved into a highly neurotic or psychotic state, there would be no jobs he'd be able to perform. If, however, the personality disorder is under some controls, such has been manifested today, there'd be a variety of jobs he'd be able to perform."

Regarding Metcalf's temper, Dr. Grenfell opined: "If the temper is under fair control, there'd be a variety of jobs he could perform. But if the temper is not under good—is not under fair control, then he would not get through a probationary period, any kinds of work experience." Dr. Grenfell then concluded: "Taking all the facts into consideration [set forth in] your hypothetical, with the fact that * * * his temper is under fair control, * * * some of the jobs you might expect him to perform * * * would be such jobs as a dishwasher, a veterinarian's assistant * * * a watchman, or a gatekeeper, and there would also

be a number of custodial jobs, such as a sweeper * * * or cleaning restrooms."

On the basis of the aforementioned evidence, the ALJ found that despite the presence of a severe impairment, Metcalf retains the residual functioning capacity to perform his past relevant work as a dishwasher.

Metcalf initially contends that the ALJ failed to consider his severe non-exertional impairment of alcoholism. The evidence contained in the administrative record revals that Metcalf has been a chronic alcoholic since the age of ten. At the hearing, however, when asked about his current alcohol consumption, Metcalf responded that he had not used any alcohol during the previous year and a half. The ALJ found Metcalf's testimony to be credible because there was evidence in the record indicating that Metcalf had consistently reported to physicians that he had not been drinking alcohol and, furthermore, there were no signs or evidence to the contrary.

■ Metcalf correctly asserts that alcoholism alone, or in combination with other impairments, can be disabling. *See Brand v. Secretary of HEW*, 623 F.2d 523, 524 n. 1 (8th Cir.1980). In *Adams v. Weinberger*, 548 F.2d 239 (8th Cir.1977), we noted that in order to establish a disability predicated on alcoholism, the claimant must show: (1) that he has lost self-control to the point of being "impotent to seek and use means of rehabilitation," and (2) that his disability is encompassed by the Act. *Id.* at 245. "[A] finding of an ability to control alcoholism cannot rest on claimant's testimony alone." *Lewis v. Califano, supra* at 456; *Adams v. Weinberger, supra* at 245.[2]

Although Metcalf has not challenged the ALJ's formulation of the hypothetical question, we note that the question was proper in that it related all of Metcalf's impairments which were supported by substantial evidence. *See Stephens v. Secretary of HEW*, 603 F.2d 36, 42 (8th Cir.1979).

1. The ALJ asked Dr. Grenfell whether "he know[s] of any jobs in significant number, in the area which the claimant lives, * * * where the claimant could work? In formulating an answer to this question, Dr. Grenfell was directed to take into account several factors relating to Metcalf's age, education, prior work experience and his mental and physical health. Dr. Grenfell was also told to consider that Metcalf is limited to having only infrequent contact with people because of his temper and low levels of stress.

2. We noted in *Adams v. Weinberger* that a claimant's testimony that he or she has the ability to control his or her alcoholism, may merely reflect "the rationalizations of a sick

In the present case, the ALJ's finding that Metcalf was not disabled due to alcoholism did not rest on Metcalf's testimony alone; rather, his testimony was corroborated by statements appearing in the medical records. On October 17, 1980, Metcalf told Dr. Earls that he had not consumed alcohol for approximately four months. On January 27, 1982, Metcalf told Dr. Earls that he had been sober for over a year and a half. A blood alcohol test administered to Metcalf on May 21, 1982 revealed no presence of alcohol. On June 1, 1983, Metcalf told Bruce Davis that he had not had anything to drink in three years. Finally, on July 21, 1983, Metcalf told Dr. Charles Ash, a consulting physician, that he had been sober for approximately three and a half years. The credibility of these statements is enhanced by the fact that the purported periods of abstention are consistent with the dates on which the statements were made. The ALJ also noted that there were no outwardly visible signs of Metcalf's alcoholism appearing on the date of the hearing. After reviewing the record as a whole, we hold that the ALJ's finding that Metcalf is able to control his alcoholism is supported by substantial evidence.

Metcalf next challenges the ALJ's finding that he could perform his past relevant work as a dishwasher despite the presence of a severe mental impairment. The ALJ found that Metcalf was suffering from a severe impairment which limited his ability to tolerate stress and to relate to others. The ALJ further found that disability could not be established under 20 CFR § 404.-1520(d) because the record does not reveal an impairment or combination of impairments which meet or medically equal any impairment contained in the Secretary's Listing of Impairments (Appendix 1 to Subpart P of Regulation 4). The ALJ then considered whether, despite his severe impairment, Metcalf retains the capacity to perform his past relevant work as a dishwasher. The ALJ found that Metcalf did have the capacity and denied disability benefits on that basis. We have carefully reviewed the administrative record as a whole and conclude that substantial evidence supports the ALJ's conclusion that Metcalf retains the capacity to work as a dishwasher.

The ALJ accorded "great weight" to the testimony of the vocational expert, Dr. Grenfell, who opined that Metcalf could work as a dishwasher if his personality disorder was not "exacerbated" to the point of psychosis and if his temper was under good control. The record record reflects substantial evidence that Metcalf's psychiatric problems and temper are under good control. On numerous occasions, Dr. Earls stated that Metcalf is "not psychotic." Metcalf's most recent psychiatric hospitalization occurred on October 7, 1982, some two and a half years before the date of the hearing. Metcalf's discharge summary, compiled by his treating psychiatrist, indicates that his prognosis was good. There is no evidence that Metcalf has received or sought any psychiatric treatment since that hospitalization, other than consultative examinations, and Metcalf was not taking any medications on the date of the hearing. There is evidence that Metcalf's temper remained a problem through May 1982; however, no evidence was presented indicating that his temper continued to be a problem as of the date of the hearing. The ALJ noted that Metcalf exhibited good control throughout the hearing and there was no evidence that this was not indicative of his recent temperment.

Likewise, there is no evidence supporting Metcalf's claim that the residual effects of thirty years of alcoholism rendered him unable to work as a dishwasher. The tests performed by Bruce Davis did indicate the probability of "borderline organic brain syndrome." However, because Metcalf's diagnosis does not meet the requirements of DSM–III, his mental impairment does not qualify as a disabling impairment contained in the Secretary's Listing of Impairments.

Finally, we note that there is no competent evidence in the record indicating that

individual who does not realize the extent of his

[or her] illness." 548 F.2d at 245.

Metcalf's severe mental impairment renders him incapable of working as a dishwasher. The only evidence in the record suggesting that Metcalf cannot perform any work whatsoever comes from Lola Henderson and Jan Henrickson, Metcalf's caseworkers at MDFS. There is nothing in the record from which to conclude that these caseworkers qualify as experts and, therefore, the ALJ appropriately accorded their opinions little weight in light of contrary opinions rendered by qualified experts. Dr. Earls opined that Metcalf is capable of functioning at a marginal level, and Dr. Parkinson opined that Metcalf is capable of performing simple, low-level stress jobs.

In conclusion, the ALJ's findings were supported by substantial evidence and the district court's decision must be affirmed.