**Karen OBERST, Appellant,**

v.

**Donna E. SHALALA,\* Secretary
of Health and Human
Services, Appellee.**

No. 92–2865.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 19, 1993.

Decided July 30, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Sept. 21, 1993.

---

\* Donna E. Shalala is substituted for former Secretary of Health and Human Services Louis W. Sullivan, M.D., as an appellee in this action under Fed.R.App.P. 43(c).

250

John B. Milligan, Lincoln, NE, argued, for appellant.

Daniel A. Morris, Omaha, NE, argued (Frank V. Smith and Michael R. Fry, on the brief), for appellee.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

BEAM, Circuit Judge.

Karen Oberst appeals the district court's judgment affirming the Secretary's denial of social security disability and supplemental security benefits. After careful review, we affirm.

■ The Secretary's denial must be upheld if substantial evidence in the record as a whole supports the Secretary's conclusion that Oberst is not disabled. *Baker v. Secretary of Health and Human Servs.*, 955 F.2d 552, 554 (8th Cir.1992). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992). Thus, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, we must affirm the decision." *Id.*

Oberst argues that the administrative law judge (ALJ) did not give adequate weight to the opinion of her treating physician. She also argues that the hypothetical question posed to the vocational expert was flawed. She contends that the question failed to precisely relate her mental limitations and impairments, in conjunction with her work history.

■ Oberst is a 46–year–old female. She has a high school diploma and attended one year of college. Her past relevant work experience includes work as an office clerk, waitress, cook, housekeeper, cashier, kitchen helper, hotel maid, dish washer, and paste-out worker for a newspaper. She is a diagnosed schizophrenic and also has back problems. The ALJ found that, although her impairments prevent her from performing her past employment, there are jobs in the national and local economy, such as that of a mail clerk, that she can perform. We agree with the rationale set forth in the district court's opinion and affirm for the reasons stated in that opinion. *See* 8th Cir.R. 47B.

We add only that the record shows that the vocational expert did consider the claimant's work history in forming the opinion that there were jobs in the economy that Oberst could perform. (Transcript at 56).

HEANEY, Senior Circuit Judge, dissenting.

Karen Oberst has not been able to hold a job on a sustained basis in the past, and

there is not substantial evidence in this record as a whole to support the ALJ's decision that Oberst could have had a job on a sustained basis from January 1, 1987,[1] through September 10, 1990 (the date of the ALJ's decision). Because there is not substantial evidence to support the Secretary's decision, we should remand to the Secretary with direction to award Oberst benefits from January 1, 1987, to March 31, 1989.[2] Alternatively, at the very least, we should direct the Secretary to order further hearings by the ALJ.

## I.

Karen Oberst, born on January 14, 1947, was diagnosed at an early age with schizophrenia, undifferentiated type, depression, negative thought pattern, and low self-esteem. She has a high school diploma, and attended two semesters of state college, and one and one-half years of business school.

Since 1970 Oberst has been employed in more than forty unskilled jobs.[3] She has been a patient at the Community Mental Health Center (CMHC) of Lancaster County, Nebraska since 1975, and Dr. Paulo R. Bahr has been her treating psychiatrist since the early 1980s.

Oberst was awarded social security disability benefits for her mental disease in October 1974 and continued to receive benefits until July 1979.[4] From that date through May 1989 she was employed at twelve different jobs for short periods of time, earning on the average only $160 per month. During this period, Oberst worked as a clerical worker, a stenographer, a typist, a cashier, a motel maid, a cook, a kitchen helper, a housekeeper, a laundry worker, and a paper folder, for a total of approximately forty months over the ten-year period. She was paid at or near the minimum wage on all jobs. Most were part-time positions.[5]

1. The January 1, 1987, date is appropriate because a case can be made that Oberst was substantially gainfully employed in 1985 and 1986, even though these jobs were arranged by A.W.A.R.E. and were in most instances partially subsidized.

2. Oberst last met the disability insured status requirements of the Social Security Act on March 31, 1989.

3. From January 1970 to May 1980 Oberst held twenty-eight different jobs ranging in length from one month to one year. Twenty-three lasted less than four months.

4. Oberst's period of disability was discontinued for approximately two months in 1977 for work activity. She made application in 1984 for restoration of disability benefits, which application was denied. She did not appeal this denial.

5. The record does not make clear why she left each of the jobs. In some instances she was terminated, and in others she left after the employer indicated dissatisfaction with her work. In still others, she left because she was unable to tolerate the stress associated with the job. The Social Security Regulations provide that if an employee's earnings average more than $300 per month during each year from 1980 through 1989, an employee will ordinarily be considered to have engaged in substantial gainful activity. 20 C.F.R. § 404.1574 (1992). Again, the record is not completely clear, but it appears that Oberst earned less than $300 per month in 1979, 1980, 1982, 1983, 1984, 1987, 1988, and 1989.

| Year | Months | Job | Wage | Days/ Wk. | Avg. Mth. Inc. |
|------|--------|-----|------|-----------|----------------|
| 1979 | June–Aug. | Clerical worker | 3.25/hr. | 5 | $184 |
| 1980 | March | Sales clerk | 3.10/hr. | 5* | 127 |
| | Nov.–Dec. | Clerical worker (CETA job) | 3.35/hr. | 5* | |
| 1981 | Jan.–July | Clerical worker (CETA job) | 3.35/hr. | 5 | 339 |
| | Aug.– Sept. | Stenographer/ typist | 3.50/hr. | 5** | |
| 1982 | | NO EMPLOYMENT. | | | |
| 1983 | July | Housekeeper/ companion | $100/mo. + rm. & bd. | 7** | *** |

· Oberst testified at the hearing that during the period from 1979 to 1986 she attempted to keep a job but could not:

I'd be scared. I didn't think people around me liked me.... I think they wanted to get rid of me, and if I had conflicts with people I, I was so up tight about it that I couldn't talk to them about it so I carried that around [with me]....

....

... [B]ecause of all that was going in around in my head I, I don't think I was doing a good job and, and I felt guilty about that so I wanted to quit cause I thought they were going to probably fire me pretty soon.

....

... I had problems—trouble concentrating, yes.

....

... Sometimes I couldn't hear what they were saying cause there was so much going on in my head.

(R. at 44.)

Oberst participated actively in the A.W.A.R.E. pre-vocational program of the CMHC during the ten-year period. At the time of the hearing, she stated that she went to the CMHC on Tuesday afternoons for one and one-half hours and on Thursday afternoons for three hours. She occasionally attended a day program called the "Club House," at which all participants perform some type of volunteer work and practice their social skills.

Oberst also testified regarding her physical problems. She said that she has a slipped disc and that her back hurts when she does too much housework. She also has premenstrual syndrome and hypertension but takes no medication for those conditions. For depression, however, she stated that she takes 20 milligrams of Prozac, 100 milligrams of Mellaril, and 50 milligrams of Amitriptylin. She also testified that with the assistance of her husband she can do her housework and grocery shopping. She can walk four blocks and can stand three hours at a stretch. Her back gets sore if she sits too long.

Note 5—Continued

| Year | Months | Job | Wage | Days/ Wk. | Avg. Mth. Inc. |
|---|---|---|---|---|---|
| 1984 | | NO EMPLOYMENT. | | | |
| 1985 | April– Aug. | Motel housekeeper. | 3.50/hr. | 30 hrs./ wk. 4 | 396 |
| | Sept.– Dec. | Cook at halfway house. | 4.20/hr. | 38 hrs./ wk. | |
| 1986 | Jan.–July | Cook at halfway house. | 4.20/hr. | 4 38 hrs./ wk. | 440 |
| 1987 | Jan. | Kitchen helper; inserted advertising; hotel maid (through A.W.A.R.E.) | 3.35/hr.** | | 32 |
| | Oct.–Dec. | Housekeeper/ laundry worker (A.W.A.R.E. job) | 3.35/hr. | 4 hrs./ day, 5 days/wk. | |
| 1988 | Jan.–Apr. | Housekeeper/ laundry worker (A.W.A.R.E. job) | 3.35 /hr. | 4 hrs./ day, 5 days/wk. | |
| | | Paper folder (A.W.A.R.E. job) | 1¢ per folded paper. | Short period of time. | 178 |
| 1989 | | Paper folder (A.W.A.R.E. job) | 1¢ per folded paper. | Short period of time. | *** |

* Oberst's yearly earnings record (R. at 219) indicates that she earned a total of $386 in 1980. Thus, obviously she worked less than forty hours per week.
** We assume that Oberst worked eight hours per day on this job, even though there is little or no evidence in the record to supprt this assumption.
*** Oberst's yearly earnings record indicates that she had no earnings for this year.

Judith Ann Hultine was called as a vocational expert by the ALJ. She testified that *certain* documents from the file had been made available to her, that she had examined them, and that she had been present during the entire hearing. (R. at 54.) The ALJ asked her the following hypothetical question:

Q. ... I want you to take into account the claimant's background, training, and education, and work experience, and I want you to assume that ... the claimant suffers essentially from a mental impairment that has been generally diagnosed as schizophrenia undifferentiated type, acute exacerbation.... [She] suffers from depression, she has negative thought patterns, and she has somewhat low esteem of her, of herself.... [She] is capable of following simple oral instructions and also to carry out the instructions under ordinary supervision. She is not able to relate appropriately to co-workers, supervisors, and also to meet rather rigid production standards. She is a person that is relegated to so-called low stress type jobs and ... has some physical impairments effecting [sic] her, knee, shoulder, and, and she has a slipped disk [sic] in her back. [She] has some physical restriction.... [S]he can walk about four blocks. She can stand for about three hours, lift 20 to 25 pounds and she has no significant restriction with respect to sitting other than apparently a stiff back if she sits for a long time.... [S]he also suffers from obesity....

....

I want you to assume ... that these impairments ... are severe enough to prevent the claimant from working at any of her former jobs. Do you have an opinion based upon a reasonable certainty as to what alternative employment the claimant could engage in, and if so, whether such a job or jobs exist in the Lincoln, Nebraska area, or other regions of the country in significant numbers?

....

A. I believe ... that she would be able to do some sedentary to light unskilled work. That work may include that work of a mail clerk....

....

... There are 246 [of such jobs] in the Lincoln area. She may be able to perform as a file clerk. That work too is considered unskilled and light. To work as—in food preparation, that, that work is considered unskilled and light exertional level.

Q. And how many file clerks or food preparers in this area or other regions of the country?

A. There are about 530 file clerks in the Lincoln area and about 700 food preparation people in the Lincoln area.

Q. And what about the stress level on these jobs?

A. The, the stress level would not be considered to be high. It would be low to moderate.

(R. at 56–58.)

## II.

The ALJ's examination of Hultine was deficient, and at the very least a remand is required. I conclude this for two principal reasons. First, we do not know what documents the ALJ made available to the expert, nor do we know when they were made available. We do not know whether she was given the medical reports of the treating or consulting physicians, the comprehensive reports from the CMHC, or the detailed information in the record with respect to Oberst's work history. All of these reports bear directly on Oberst's ability to perform the jobs of mail clerk, file clerk, and food preparation worker "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc). Perhaps the expert was given the full record and the time to examine it carefully, but I am not willing to base my decision on that assumption, particularly as the burden of proof as to her ability to perform these jobs rested with the Secretary.

Second, the hypothetical posed to the vocational expert was fatally deficient in the following respects:

(1) Hultine was told to take into account Oberst's work experience in determining whether there were jobs she could perform, but that experience was not detailed in the

hypothetical. If the expert had, in fact, carefully examined Oberst's work record before the hearing, then the absence of the work history in the hypothetical would not be fatal. Because the record does not establish that the expert performed that careful examination, the absence of the work history in the hypothetical is fatal.

(2) The hypothetical tells the expert that Oberst cannot return to *any* of her past jobs and details the reasons why she cannot, including Oberst's inability to relate to employees and supervisors, to meet production standards, and to work in stressful situations. This hypothetical necessarily assumed that Oberst worked with others in her past jobs, that she was under supervision, and that the jobs were stressful. More than likely she did work with others and was supervised, but there is little in the record on these points and nothing in the record to support the view that her past clerical and food preparation jobs were more stressful than the jobs the vocational expert testified she could have performed. The ALJ stated that the vocational expert was to assume that Oberst was employable only in low-stress jobs. While the low-stress limitation is appropriate, the expert could not possibly give an informed answer to the hypothetical unless she had a full understanding of the jobs Oberst has previously held or attempted to hold.

(3) Oberst testified that she attended the CMHC twice a week during the day for counselling. In response to this, the ALJ made the following statement:

ALJ. ... Now there's another problem I have with the hypothetical question and that has to do with the claimant attending this center twice a week.

ALJ. Is that something you absolutely have to do? Could you attend it, for example, after you get off of work?

CLMT. No, I don't think so, cause it's during the day and—Unless I worked in the morning and, and could attend in the afternoon.

ALJ. All right.

CLMT. I couldn't work at night because I don't have a car unless I got transportation with some other worker.

ALJ. Well, well, we'll exclude that mental health clinic attending twice a week

cause there are jobs you can—could be performed which you would not have to be attending this—that is to say, in the evening or some other time.

(R. at 57.) The record is not clear as to what the ALJ meant by the latter statement. Was he saying Oberst's mental health did not require that she keep her two weekly afternoon appointments with the CMHC? Was he suggesting that she could get the same treatment in the evening? Or was he limiting the jobs she could perform to those which would not interfere with her afternoon treatment sessions? What the ALJ had in mind was important because there is no evidence in the record to support the view that Oberst did not need the treatments or that she could get them in the evening.

### III.

While a remand for a further hearing is acceptable to me on the basis of the record presently before us, the preferable course would be to reverse with directions to the Secretary to award Oberst disability benefits from January 1, 1987, through March 31, 1989. There is very little, if any, evidence in the record before us to support the conclusion that Oberst is able to work as a mail clerk, a file clerk, or a food preparer on a sustained basis "in the sometimes competitive and stressful conditions in which real people work in the real world."

Since 1975 Oberst has been a patient at the CMHC and has been placed in numerous jobs by the CMHC, some subsidized and others not. In the fourteen years that she has participated in the CMHC program, she has been unable to hold a job—even with the considerable support that she receives from the CMHC. *See supra* n. 5.

Everyone agrees that Oberst is capable of following simple instructions under ordinary supervision but that she is not able to relate to co-workers and supervisors. No one, however, has explained how Oberst can function in our competitive economy over a continuous period of time if she is not able to relate to either her co-workers or her supervisors. However unskilled or low stress the job, Oberst ultimately will have to relate appro-

priately to co-workers, supervisors, and the general public in a limited degree at least.

There is, moreover, no explanation in this record as to why Oberst, who has been found unable to do her past work as an office clerk or a food preparer or any of the other numerous jobs she has held, was able at all times through the date of the hearing decision to do work of the same kind and description. The rationale of the vocational expert and the ALJ seems to be that there are numerous jobs in the local economy that are less stressful than she has attempted in the past. There is, however, absolutely no discussion of this point in the record. We have only a conclusory statement by the vocational expert—who was neither asked nor volunteered to differentiate between the low-stress, unskilled food preparer jobs that Oberst was unable to do in the past and those that she states Oberst was capable of performing during the time period Oberst alleges disability. Moreover, no one has suggested, nor could they, that there are in fact jobs in the local community that do not require a worker to relate appropriately to co-workers and supervisors.

No one is closer to Oberst, nor has anyone tried harder to place Oberst in an appropriate job than the personnel at the CMHC. One cannot read the reports from the CMHC dated January 11, 1985, February 26, 1987, and November 26, 1990, without being left with the firm conviction that Oberst, even with the help of the CMHC, would *not* have been able to work as a mail clerk, file clerk, or food preparer in our competitive economy during the relevant period of time. The January 11, 1985, report from Barbara Borland, Oberst's mental health nurse counsellor, and Dr. Bahr, her treating physician, states as follows:

> *Work History:* Karen has had a poor work history for many years. When she was referred here to the Mental Health Center, this was listed as one of her problems. The Mental Health Center in Scottsbluff reported that "her work history for the past 9–10 years as sporadic with increasing periods of unemployment." [1965 to 1975]
>
> . . . .

Four to five years ago she was involved with the CETA Program and was working at the University of Nebraska doing secretarial work as on the job training. She has some problems getting along with her supervisor and co-workers. She became frustrated very easily and it was difficult for her to keep track of her duties.

After completion of that training, she has difficulty finding work. Her last job was in 1981 when she worked for several months with the Nebraska Dental Association as a secretary. She quit that job because of feelings of persecution. She tended to feel disapproved of by others and believed that people were taking delight in antangonizing [sic] her.

The emotional problems she experiences become worse when she is under stress and pressure whether its [sic] job related or with inter-personal relationships. She is unable to follow conversations or instructions. Even when she asks for things to be repeated she is still unable to follow what is being said. At times she also misinterprets what is said to her. Her concentaration [sic] become worse. . . .

She becomes tense, irritable, and feels overwhelmed under fairly ordinary pressures. It appears she has limited capacities. She feels uncomfortable and overwhelmed in work situations. Her anxiety, self-doubts, and psychotic thinking restrict her ability to handle tasks of any significant complexity.

. . . .

. . . Her history suggests that she is unable to maintain work for any length of time. She has had a long history of vocational instability. Even though she has been in several different training programs through Vocational Rehabilitation and CETA, she experienced problems while working. Some of her problems had to do with her inability to get along with supervisors and co-workers due to her psychotic thinking.

(R. at 336–37, 339.) The February 26, 1987, report from Dr. Bahr is also important:

> *Current level of daily functioning:* The patient exhibits a very limited ability to relate to others. The patient is a rather

quiet, withdrawn individual who tends to over-react to stress. She displays a rather restricted daily activity.

*Clinical impression of patient's impairment in relation to work related activities:* Patient exhibits a poor ability to relate to fellow workers and supervisors. The patient is capable of understanding and following instructions.

The patient is able to perform simple repetitive tasks. The patient demonstrates very limited ability to tolerate stresses and pressures of work related activities.

(R. at 354.) The November 26, 1990, report from Dr. Bahr states that

Karen has continued to work on therapy issues involving increasing assertiveness, self-esteem and the role of self-responsibility in her emotional states. But her thought disorder, anxiety and depressive propensities continue to inhibit her ability to work at this time. I do consider Karen to be unable to secure and hold gainful employment currently.

(R. at 401.)

If ever there were a case in which the treating physician and clinician reports should be afforded great weight, this is it.[6] The patience of the CMHC's personnel with Oberst has known no bounds. Time after time they have either placed her or helped her find jobs only to learn that she is unable to hold those jobs over a sustained period of time. In a report dated October 23, 1989, Dr. Charles Richardson reported that

it appears [Oberst] is able to hold a job for periods of time, but ultimately symptoms accumulate, particularly her hypersensitivity and discomfort around other people, leading to her being unable to sustain a job for prolonged periods of time.

. . . .

. . . Predictably she will continue to have a great deal of difficulty. There is no reason to think this is going to improve. . . . *Conceivably* she could maintain work for long-

er periods of time if it was fairly isolative from other people, involved highly routine repetitive work, dealing with objects or machines, not dealing with people.

(R. at 192) (emphasis added). "Conceivably" falls far short of substantial evidence to support a finding that Oberst is able to do sustained work in the competitive economy.

The ALJ, in posing the hypothetical question to the vocational expert, completely ignored the comments of Dr. James Pipher, a clinical psychologist, from his report of June 26, 1989:

Recently it was mutually decided by Karen and her mental health counselor, that she needed the greater degree of structure as provided by a return to participation in the Day Treatment Program.

. . . .

. . . It is likely that Karen will need the continued support and structure provided by services at the Community Mental Health Center.

(R. at 388.)

The only support for the Secretary's position is found in the January 14, 1985, and September 23, 1986, reports of Dr. William R. Stone, Jr., a clinical psychologist in Lincoln, Nebraska, and a consultant to the Secretary, which were based exclusively on two office interviews.[7] The only comments made in Dr. Stone's 1985 report with respect to Oberst's ability to work are as follows:

[Oberst] is capable of understanding simple, primarily oral instructions and is capable of carrying out such instructions under ordinary supervision. . . .

. . . I would think she would have some difficulty in [relating appropriately to coworkers and supervisors]. . . .

. . . . There is no evidence obtained, *on this interview*, of any other impairment which would prevent [Oberst] from meeting mini-

---

**6.** *See Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir.1991) ("[A] treating physician's opinion is normally accorded a higher degree of deference than that of a consulting physician. . . ."); *Turpin v. Bowen*, 813 F.2d 165, 170–71 (8th Cir.1987).

**7.** *McCoy v. Schweiker*, 683 F.2d 1138, 1147 n. 8 (8th Cir.1982) ("[T]his Court has held that as a general rule little weight is afforded to . . . reports of consulting physicians who examine the claimant only on one occasion. . . .").

mum quality/quantity standards for simple, repetitive unskilled work.

(R. at 346) (emphasis added).[8] The problem with this report and that of September 23, 1986, is that Dr. Stone does not include his opinion as to whether Oberst is able to work on a sustained basis in the competitive economy. No one argues that Oberst's disability, other than her mental impairments, prevent her from working.

In summary, the evidence that Oberst is disabled is overwhelming and supports a reversal and a remand to the Secretary with directions to award disability benefits to Oberst from January 1, 1987, to March 31, 1989.

## IV.

I also think it necessary to comment on the majority's definition of substantial evidence: "if it is possible to draw inconsistent positions from the evidence and one of these positions represents the agency's findings, we must affirm the decision." *Supra* at 250–51. This definition suggests we are constrained to affirm a decision of the Secretary whenever there exists any evidence in the record to support the Secretary's findings. The law does not support this position.

We are obligated to affirm only if there is *substantial evidence on the record as a whole to support the Secretary's decision. Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 554 (8th Cir.1992). I acknowledge the majority's reference to the test stated in

*Robinson v. Sullivan,* 956 F.2d 836 (8th Cir. 1992), in support of its offending language. *Robinson* relies on *Cruse v. Bowen,* 867 F.2d 1183 (8th Cir.1989), and *Cruse,* in turn, relies on *Consolo v. Federal Maritime Comm.,* 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).[9] Unfortunately, in the transition, the meaning of the Supreme Court's language in *Consolo* has been inverted and its substance eviscerated. The Supreme Court stated that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* 383 U.S. at 620, 86 S.Ct. at 1026. I agree that the possibility of two inconsistent conclusions will not preclude a reviewing court from affirming the decision of an administrative agency, but the decision must still be supported by substantial evidence. The majority, however, now holds that whenever one may draw two inconsistent conclusions we *must* affirm. Somewhere in the transition, the majority has discarded the requirement that the agency's findings be supported by substantial evidence. I cannot concur in the abandonment of that standard.

For the reasons stated herein, I respectfully dissent.

---

**8.** The September 23, 1986, report is essentially a reflection of the January 14, 1985, report.

**9.** This court has referred to the Supreme Court's language regarding substantial evidence set forth in *Consolo* in twelve published opinions either directly or indirectly. In two of these opinions, this court has diluted the Supreme Court's language like the majority has done in the present case. *See Robinson v. Sullivan,* 956 F.2d 836, 838 (8th Cir.1992); *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992). In the remaining ten opinions, however, this court has applied *Consolo*'s language regarding substantial evidence as it was intended by the Supreme Court. *See Reed v.*

*Sullivan,* 988 F.2d 812, 815 (8th Cir.1993); *Zahradnik v. Sullivan,* 966 F.2d 355, 361 (8th Cir. 1992); *Browning v. Sullivan,* 958 F.2d 817, 820 (8th Cir.1992); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 554 (8th Cir.1992); *Russell v. Sullivan,* 950 F.2d 542, 544 (8th Cir. 1991); *Glassman v. Sullivan,* 901 F.2d 1472, 1474 (8th Cir.1990); *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989); *Metcalf v. Heckler,* 800 F.2d 793, 794 (8th Cir.1986); *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir.1984); *Medical Center of Independence v. Harris,* 628 F.2d 1113, 1117 (8th Cir.1980).