801 F.Supp.2d 846 (2011)
Ronald S. GORDON, Plaintiff,
v.
Michael J. ASTRUE, Commissioner of Social Security, Defendant.
Case No. 4:09CV1684 HEA.
United States District Court, E.D. Missouri, Eastern Division.
March 17, 2011.
*848 David D. Camp, Access Disability, LLC, St. Louis, MO, for Plaintiff.
Jane Rund, Office of U.S. Attorney, St. Louis, MO, for Defendant.

OPINION, MEMORANDUM AND ORDER
HENRY EDWARD AUTREY, District Judge.
This matter is before the Court on the Report and Recommendation, of Magistrate Judge Terry I. Adelman, that the decision of the Commissioner be reversed and remanded. Plaintiff has filed written objections to the Report and Recommendation. When a party objects to the magistrate judge's report and recommendation, the Court must conduct a de novo review of the portions of the report, findings, or recommendations to which the party objected. See United States v. Lothridge, 324 F.3d 599, 600 (8th Cir.2003) (citing 28 U.S.C. § 636(b)(1)). Pursuant to 28 U.S.C. § 636, the Court will therefore conduct such a de novo review.
Plaintiff has no objection to a reversal and remand pursuant to the Report and Recommendation, with the sole exception of the time frame to be considered. While this matter was pending in this Court, Plaintiff filed a subsequent claim for disability benefits and, on May 5, 2010, another ALJ determined that Plaintiff became disabled on September 17, 2008. Neither party has alleged any error made by the second ALJ. The Court agrees with Plaintiff that before Plaintiff's current eligibility could be terminated, Defendant must follow the due process requirements of 20 C.F.R. § § 404.316, 404.1594, 404.1597, 416.994 and 416.995 and provide Plaintiff with an initial notice, a reconsidered decision, followed by an opportunity for a hearing before an ALJ and then opportunity for review by the Appeals Council. *849 Therefore, the scope of the remand shall be limited to consideration of Plaintiff's eligibility before the date covered by the subsequent award, i.e., for the period from January 16, 2006 through September 17, 2008, and in accordance with Judge Adelman's findings and conclusions as stated in the Report and Recommendation. The Court also adopts the Report and Recommendation in its entirety.
Additionally, on remand, the ALJ should give proper weight to Plaintiff's physicians or properly discount the opinions as specified in the regulations. To the extent that the ALJ relies upon non-examining consultive evaluations, the ALJ should explain his reasoning for giving these opinions greater weight. Further, the ALJ should support his assessment of Plaintiff's residual functional capacity ("RFC") with references to specific medical and non-medical evidence in the record. Finally, if the ALJ modifies Plaintiff's RFC, he should submit a new hypothetical question to a vocational expert in determining whether Plaintiff is capable of performing work that exists in significant numbers in the national economy.
Accordingly,
IT IS HEREBY ORDERED that the decision of the Commission is REVERSED and REMANDED for further proceedings as set forth above ...
A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

REPORT AND RECOMMENDATION
TERRY I. ADELMAN, United States Magistrate Judge.
This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income benefits under Title XVI of the Act. The case was referred to the undersigned pursuant to 28 U.S.C. § 636(b).

I. Procedural History
On August 17, 2006, Plaintiff protectively filed an application for a Period of Disability and for Disability Insurance Benefits ("DIB"). (Tr. 55, 103-108) He filed an application for Supplemental Security Income ("SSI") on September 7, 2006. (Tr. 50, 55) Plaintiff alleged disability beginning January 16, 2006 due to depression, anxiety, fatigue, and bi-polar disorder. (Tr. 103, 136) Plaintiff's applications were denied on September 5, 2006, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 50-54, 63-67, 72) On August 1, 2008, Plaintiff appeared and testified at hearing before an ALJ. (Tr. 9-49) In a decision dated September 16, 2008, the ALJ determined that Plaintiff had not been under a disability from January 16, 2006 through the date of the decision. (Tr. 55-62) On August 24, 2009, the Appeals Council denied Plaintiff's Request for Review. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

II. Evidence Before the ALJ
At the hearing before the ALJ, Plaintiff was represented by counsel. Plaintiff testified along with a Vocational Expert, Dr. Jeffrey Magrowski, and Plaintiff's wife, Toria Gordon. Plaintiff stated that he was 48 years old and completed two years of college and one year of vocational training in heating, ventilation, and air conditioning. He lived with his wife and his daughter who was almost 18 years old. Plaintiff last worked in April or May of 2006. He alleged an onset date of January 2006 because that was the first time he saw a doctor. He unsuccessfully tried to return to work after. (Tr. 10-17)
Plaintiff testified that he weighed around 285 pounds and measured 6 feet, 1 *850 inch. He suffered an injury at the gym in late 2005 and had not worked out a gym since then. However, he had tried to exercise at home. He was able to read and write. He had driver's license and drive periodically. (Tr. 18)
Plaintiff last worked as a maintenance tech/HVAC mechanic for McCormick and Barron. He worked there from 1995 to January 2006. Before that. Plaintiff performed HVAC maintenance but could not remember the names of his employers. (Tr. 18-19)
Plaintiff testified that he could no longer work because he was physically and mentally incapable. He stated that depression and anxiety has torn him to pieces and affected his ability to comprehend and recall. If he physically exerted himself, "it [took] vengeance on [him]." Plaintiff testified that he was a healthy man but became addicted to heroin. He tried to return to work after recovering from his addiction but stated he got lost. The next day. Plaintiff felt like a wrecking ball hit him, and he could not get out of bed. He stated that he went from being robust to being broke. With regard to his heroin addiction. Plaintiff testified that he became addicted to heroin but then experienced years of sobriety. The addiction reappeared when his illness started and he used heroin to give him a peaceful day. He last used heroin over a year before the hearing. (Tr. 19-21)
At the time of the hearing. Plaintiff took Xanax, Ritalin, and a blood pressure medication. He testified that the blood pressure medication kept his blood pressure under control. Plaintiff did not have a psychiatrist, although his physician was trying to find one. Plaintiff last saw a psychiatrist about a month-and-a-half before the hearing. He stated that he first saw Dr. Hamada and then switched to Dr. David Thompson but that he did not currently have a treating psychiatrist. His medical doctor. Dr. Armbruster, prescribed Plaintiff's medications. Plaintiff also testified regarding problems with his right shoulder, which he injured doing karate years ago. (Tr. 21-24, 41-42)
On a daily basis. Plaintiff woke up, which took him a couple of hours to come together. He got up, fixed something to eat, and tried to read. His comprehension faded after an hour, after which time he got up and tried to do something light around the house. After about 30 or 40 minutes, the "wrecking ball" would hit him again and drain him. He would sit back down, pray, and wait for some strength to return while watching a movie. Plaintiff further testified that his days did not have a certain pattern. Some days he was capable of doing something substantial for about 1½ hours. He tried walking but could not walk further than a quarter mile. Plaintiff's doctor changed the Ritalin prescription, and Plaintiff stated he was doing better mentally but not physically. Plaintiff opined that he could stand for 30 minutes but then his body would get heavy. He regained his strength from between 45 minutes to an entire day. Plaintiff had problems sitting down because he would drift off, and he hated napping because he felt worse when he awoke. Plaintiff reported no problems with his hands or feet. He believed he could lift 10 pounds, as he had been using 10-pound barbells. He experienced problems taking care of his personal needs because of his physical problems. However, he could perform household chores such as cleaning the gutters, doing laundry, and cooking in the microwave. His wife performed the vacuuming and sweeping. (Tr. 24-28)
Plaintiff testified that he watched very little TV but was able to follow the news on CNN. He had no problems getting along with others. In addition, Plaintiff stated that he occasionally shopped at the *851 grocery store with his wife. However, he did not like to be in a crowd. (Tr. 28-29)
With regard to his medications. Plaintiff testified that he experienced side effects. The Ritalin sped up his mind, but his body could not keep up with it. Plaintiff had no problems with Xanax, stating that it brought him peace without the illegal use of drugs. Plaintiff still smoked about a half pack a day but was trying to quit on his doctor's advice. Plaintiff's sleep was okay, but his appetite fluctuated. Plaintiff had never dieted, and he ate more than before because it helped his nausea. The doctor had also given Plaintiff Prevacid for nausea from possible acid reflux. (Tr. 29-32)
Upon questioning by Plaintiff's attorney. Plaintiff testified that he had been receiving long-term disability benefits from an insurance company but that the two years of benefits expired that month. Plaintiff did not experience crying spells. Although Plaintiff discussed fatigue as a side effect with his doctor, he no longer experiences fatigue from his medications. Any fatigue he continued to feel resulted from exertion. (Tr. 32-35)
Plaintiff's wife, Toria Gordon, also testified at the hearing. She stated that she had been married to Plaintiff for 6 years. Mrs. Gordon testified that Plaintiff tried to do things around the house but would become panicked, sweaty, and weak. Plaintiff's chores included taking out the trash, but he was no longer able to cut the grass, move furniture, vacuum, or bring clothes up from the basement. Further, since 2006, Plaintiff was not as social or intelligent as he used to be. His concentration was poor, and Mrs. Gordon did not trust his driving. Plaintiff had no interest in going places or in having a social life. His concentration was limited, and he had problems remembering things. (Tr. 35-38)
Mrs. Gordon first noticed a change in Plaintiff when he did not want to get up for work. She realized that it wasn't him because he was always a hard worker. In addition, she testified that Plaintiff was up several tunes during the night and that mornings were bad for him. Plaintiff still attended church every week. (Tr. 38-40)
A vocational expert ("VE"), Dr. Jeffrey Magrowski, testified regarding Plaintiff's ability to work. The VE stated that Plaintiff's past work as a maintenance man was typically a skilled medium job that could go up to very heavy. The ALJ then asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work experience. The individual could perform work at the medium exertional level with limitations to reaching overhead no more than frequently on the right. In addition the individual should avoid concentrated exposure to unprotected heights and hazardous machinery, and he was limited to performing simple tasks which required no more than occasional contact with the general public and co-workers. Given these limitations, the VE stated that such individual could not perform Plaintiff's past work. However, such individual could perform other jobs in the national economy. Examples of jobs included mail clerk, which was an unskilled, light position; picking table worker for select items off of a line, which was an unskilled, light position; and cleaning worker, which was also light and unskilled. (Tr. 43-45)
If the VE assumed that the same individual was limited to no more than light exertional level work, the VE's testimony remained unchanged. However, if the VE assumed that the individual had the additional limitation that the job must allow for occasional, unscheduled disruptions of the workday and workweek, no jobs existed in the national economy which that individual could perform. (Tr. 45)
*852 Upon questioning by Plaintiff's attorney, the VE stated that, based upon limitations described in medical source statements, the hypothetical individual could not perform either Plaintiff's past relevant work or other jobs in the economy. (Tr. 46)
Plaintiff also completed a Function ReportAdult on September 15, 2006. Plaintiff reported that he felt fine after 9 days of detoxification but the next day he was confused and exhausted. He was unable to care for himself as well as before and sometimes needed reminders taking medication. He was able to prepare sandwiches, along with bacon and eggs. He no longer had the energy for yard work, but he sometimes vacuumed. Plaintiff was able to walk, drive a car, and ride in a car. In addition, he shopped in stores and on the computer. He no longer enjoyed past hobbies of martial arts, fishing, working out, and writing. Plaintiff socialized with friends and family and attended church twice a month. Plaintiff reported that his conditions affected lifting, squatting, bending, standing, walking, kneeling, talking, stair climbing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. He believed he could walk 2 blocks before needing to rest for 10 minutes. He could pay attention for 15 to 20 minutes and did not finish what he started. (Tr. 118-25)
Plaintiff's wife also completed a Function ReportAdultThird Party which basically mirrored Plaintiff's report. She stated that Plaintiff could sweep the porch, water flowers, vacuum floors, and carry laundry but that he could perform these chores for just a few minutes a day. (Tr. 126-34)

III. Medical Evidence
Prior to Plaintiff's alleged onset date, he was treated for hypertension, right shoulder pain, and anxiety. Dr. Dunet F. Belancourt prescribed Norvasc, Wellbutrin, Vicodin, Dilaudid, and Valium. (Tr. 227-32)
In January 2006, Plaintiff received treatment from the Valley Hope Association for substance abuse, which caused or contributed to feeling sick daily due to withdrawal and problems at work. He was admitted on January 6, 2006 and discharged on January 18, 2006, after leaving treatment against clinical advice. Plaintiff made only limited progress in pursuing treatment goals, and he did not appear to accept his addiction as a disease. His prognosis on discharge was guarded. (Tr. 165-81)
Plaintiff followed up with Dr. Belancourt on January 20, 2006. Plaintiff reported fatigue when he returned to work. Dr. Belancourt diagnosed depression, took Plaintiff off work for 2 weeks, and prescribed Effexor and Foltx. (Tr. 226) On February 3, 2006, Dr. Belancourt diagnosed drug addiction, fatigue, and depressive reaction. He prescribed Zoloft and continued Effexor. (Tr. 225) On February 17, 2006, Dr. Belancourt discontinued the Effexor and noted that Plaintiff could return to work on February 20. (Tr. 224)
On March 1, 2006, Plaintiff reported being nervous and shaky when he returned to work. Dr. Belancourt diagnosed anxiety, decreased Plaintiff's Zoloft dose, and referred Plaintiff to a psychiatrist. (Tr. 223) Dr. Belancourt diagnosed severe depression on March 8, 2006 and noted that he would follow up only after Plaintiff saw a psychiatrist. (Tr. 222)
Lisa Armbruster, M.D. examined Plaintiff on March 14, 2006 for moodiness and not feeling like himself. Dr. Armbruster assessed major depression, fatigue, and insomnia. She prescribed Cymbalta. (Tr. 251) On March 22, 2006, Plaintiff complained of an inability to sleep. Dr. Armbruster diagnosed major depression and insomnia and increased the dosage of Cymbalta. (Tr. 250) Plaintiff reported on *853 March 28, 2006 that the Klonopin 1 mg was not working, and he needed something stronger. Dr. Armbruster increased the Klonopin to 2 mg. (Tr. 249) Plaintiff's mood and diagnosis of major depression remained unchanged on April 5, 2006. Dr. Armbruster continued Plaintiff on Cymbalta and Klonopin and referred Plaintiff to a psychiatrist. (Tr. 248) On April 28, 2006, Dr. Armbruster noted that Plaintiff's depression had improved. (Tr. 247)
Psychiatrist Aqeeb Ahmad, M.D., evaluated Plaintiff on May 2, 2006. Dr. Ahmad noted successful drug detoxification, along with depression and poor sleep. He diagnosed possible bipolar disorder and assigned a Global Assessment Functioning score of 55[1]. Dr. Ahmad also recommended a sleep study, discontinued Cymbalta, and prescribed Symbyax. (Tr. 202-03, 381-83)
Between May and October 2006, Plaintiff attended follow-up visits with Dr. Armbruster on 7 occasions. (Tr. 236-45) On May 11, 2006, Plaintiff complained of shoulder pain from his previous rotator cuff injury. Dr. Armbruster assessed rotator cuff tendonitis with a possible tear and prescribed Naproxen and Vicodin for pain. She also noted that Plaintiff's depression was improved. (Tr. 245) On June 6, 2006, Dr. Armbruster noted that Plaintiff had restarted using heroin. His shoulder tendonitis had improved. She assessed major depression and fatigue, substituted Wellbutrin for the Symbyax, and advised Plaintiff to follow up with his psychiatrist. Plaintiff vowed to stay off heroin. (Tr. 243)
Plaintiff reported that the Wellbutrin helped with "heaviness" but caused increased anxiety during a June 26, 2006 visit. He stated that he had been off heroin. Dr. Armbruster assessed major depression, probably bipolar disorder; anxiety; and depression. She continued the Wellbutrin and added Depakote and Clonazepam. (Tr. 242) On July 7, 2006, Plaintiff stated that large cup of water fell on his pills. He also reported that the Clonazepam stopped the anxiety. Dr. Armbruster diagnosed major depression and anxiety and recommended a brain MRI. She also switched to a prescription for Klonipin. Plaintiff was to see his psychiatrist in 2 weeks. (Tr. 241)
Dr. Armbruster's notes on July 13, 2006 indicated that Plaintiff called disturbed and defensive over the doctor's concern about the Clonazepam being ruined by water. Plaintiff mentioned that heroin was his drug of choice and that Klonopin did not make him "high." (Tr. 240) On August 11, 2006, Plaintiff had not undergone the MRI. He reported drowsiness, heaviness, and exhaustion with short walks. Dr. Armbruster assessed fatigue, insomnia, and major depression. She increased his dose of Wellbutrin, discontinued Clonazepam, and added Risperdal. (Tr. 239) Plaintiff reported improvement with regard to the heaviness during an August 31, 2006 visit. He was still lethargic and depressed, however. Dr. Armbruster assessed severe fatigue and major depression. (Tr. 238)
During a phone call on September 20, 2006, Plaintiff informed Dr. Armbruster that he had not used heroin that day but that the depression made him return to using 1 time a week. He was suffering severe withdrawal. Dr. Armbruster prescribed 24 Methadone pills. In addition, she called a substance abuse provider and psychiatrist, Dr. Kuhn, and advised of Plaintiff's severe depression and heroin use. Plaintiff was scheduled to see Dr. *854 Kuhn a week later. (Tr. 237) On October 2, 2006, Plaintiff reported being in an East St. Louis hospital for 3 days and was given Methadone and a muscle relaxant. The diagnosis was fatigue and major depression. (Tr. 236)
A Psychiatric Review Technique form completed by a medical consultant on October 18, 2006 diagnosed Plaintiff with Depressive Disorder, not otherwise specified; Anxiety Disorder, not otherwise specified; and Opiate Dependence, reportedly in short term partial remission. The consultant noted mild restrictions of activities of daily living and difficulties in maintaining concentration, persistence, or pace, and moderate limitations with regard to difficulties in maintaining social functioning. The medical consultant further found at least 3 documented/reported periods of opiate and/or heroin use while on psychotic medications and found Plaintiff's clinical and functional allegations only partially credible. (Tr. 256-67)
A Mental Residual Functional Capacity Assessment completed on that same date noted only moderate limitations to Plaintiff's ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to work in coordination with or proximity to others without being distracted by them, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. In addition. Plaintiff was moderately limited in his ability to interact appropriately with the general public, get along with co-workers or peers, and maintain appropriate social behavior and adhere to basic standards of neatness and cleanliness. With regard to Plaintiff's adaptation, the consultant opined that Plaintiff was moderately limited in his ability to set realistic goals or make plans independently of others. The medical consultant concluded that Plaintiff should avoid work involving significant public contact and/or teamwork as well as work involving complex/detailed material. Further, Plaintiff needed to be abstinent from drugs and alcohol and should maintain medication compliance. He would benefit from vocational rehabilitation. (Tr. 268-70)
A medical consultant also completed a Physical Residual Functional Capacity Assessment, opining that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for about 6 hours in an 8-hour workday; and push/pull in an unlimited capacity. Further, Plaintiff could only occasionally climb due to fatigue. The consultant found Plaintiff's complaints only partially credible, as Plaintiff had 5/5 strength throughout and did not indicate balance issues or falls due to fatigue. (Tr. 271-76)
Plaintiff returned to Dr. Ahmad on several occasions from July to December of 2006. (Tr. 374-80) On July 24, 2006, Dr. Ahmad noted high anxiety and diagnosed major depression, along with a GAP of 50[2]. (Tr. 380) Dr. Ahmad provided the same diagnosis during a September 2, 2006 visit. (Tr. 379) On October 28, 2006, Plaintiff reported feeling like a broken man. He started using drugs again, and his last drug use was 2 weeks before the appointment. Dr. Ahmad assessed major depression, opiate addiction, and personality disorder, not otherwise specified. (Tr. 378) On November 6 and 20, 2006, Plaintiff reported that he did not take his lithium. *855 Dr. Ahmad diagnosed major depression and a GAF of 35[3]. (Tr. 376-77)
Plaintiff reported using opiates again and suffering withdrawal symptoms on December 26, 2006. Dr. Ahmad assessed opiate addiction and major depression, along with a GAF of 45. (Tr. 375) Plaintiff was still using opiates on December 30, 2006, and Dr. Ahmad again assessed opiate addiction and assigned a GAF score of 35. (Tr. 374)
Dr. Armbruster completed a Physical Medical Source statement dated January 4, 2007, describing only Plaintiff's limitations that would remain if he stopped using drugs or alcohol. Her diagnoses included bipolar depression, fatigue, and right shoulder tendonitis. Dr. Armbruster opined that in an 8-hour workday. Plaintiff could sit and stand for an unlimited time; walk for 1 hour; and lift and carry 25 pounds frequently and 50 pounds occasionally. Further, she noted that Plaintiff had limitations in his ability to handle and work with small objects with his hands and his ability to hear and understand simple oral instructions or communicate simple information. He could only occasionally reach above his head due to his shoulder problems, which produced pain for 4 hours twice a week. In addition, Dr. Armbruster stated that Plaintiff's medications caused the need for him to lie down during the day, and he would need to take 4 breaks a day due to fatigue. She opined that Plaintiff's limitations lasted 12 continuous months, beginning November 1, 2005. (Tr. 277-80)
Plaintiff was admitted to an Inter-Disciplinary Treatment program for chemical dependancy at Christian Hospital from February 1 to 20, 2007 for treatment of opiate dependency and major depression. As treatment progressed. Plaintiff reported a decrease in depressed mood, improved affect, improved sleep, and skills to prevent a relapse. (Tr. 305-11)
David A. Lipsitz, Ph.D., performed a consultative examination on February 5, 2007 at the request of Plaintiff's attorney. Plaintiff's chief complaint was that the bottom had fallen out on him and physically everything was hard. He became screwed up mentally and had no life. Dr. Lipsitz performed a mental status exam and noted that Plaintiff appeared in acute distress. His affect was flat, and his mood was depressed with, psychomotor retardation. His intellectual functioning was within the low range. In addition, his thought processes were preoccupied with his medical and mental problems. Dr. Lipsitz diagnosed major depression, recurrent; heroin addiction; rule out personality disorder; disease of the musculoskeletal system; occupational problems; problems with social environment; and a GAF of 40. He recommended combining medication with individual psychotherapy to alleviate mood disturbances and help him make a maximal adjustment to his environment. (Tr. 282-85)
Dr. Lipsitz also completed a Medical Source Statement on that same date. He found marked limitations in Plaintiff's ability to cope with stress and function independently, along with moderate limitations in behaving in an emotionally stable manner and maintaining reliability. With regard to social functioning, he noted marked limitations in Plaintiff's ability to interact with the general public and work in coordination with others; moderate limitations in accepting instructions and responding to criticism and in maintaining socially acceptable behavior; and moderate to marked limitations in his ability to *856 relate in social situations. Plaintiff's ability to maintain regular attendance and be punctual, perform at a consistent pace, and sustain an ordinary routine without special supervision were moderately limited. Further, Dr. Lipsitz opined that Plaintiff had a substantial loss of ability to respond appropriately to supervision, co-workers, usual work situations, and changes in a routine work setting. He assessed the limitations as having lasted 12 consecutive months beginning in November 2005. In addition, he observed Plaintiff sober and free of the effects of drugs or alcohol. (Tr. 286-87)
Between January and November 2007, Plaintiff saw Dr. Ahmad on numerous occasions. Dr. Ahmad assessed opiate addiction and major depression. The GAF assessments ranged from 41 to 51. Dr. Ahmad prescribed numerous medications, and Plaintiff showed improvement. (Tr. 361-73) Blood testing through Global Drug Testing Services in March, September, and October 2007 were negative. (Tr. 404-06)
Plaintiff returned to Dr. Armbruster in October, November, and December 1007. She diagnosed hypertension, pain, major depression, and anxiety. In addition. Dr. Armbruster continued the Wellbutrin and recommended psychiatric treatment. (Tr. 393-96) In January, March, May, and June 2008, Plaintiff visited Dr. Armbruster for complaints of anxiety, increased depression, and swelling in his ankles and feet. (Tr. 384-91) Drug tests administered in January and June 2008 were negative. (Tr. 401-03)
On January 3, 2008, Jeremy R. Thompson, M.D., performed a psychiatric assessment of Plaintiff, who described profound weakness, fatigue, anhedonia, poor sleep quality, persistent low mood, and difficulty concentrating. Plaintiff's last psychiatric visit was 3 or 4 months before. Plaintiff reported being opiate free for over a year, with continued weakness and low mood symptoms. His current medications were Xanax, Aspirin, Benicar, and Hydrochlorothiazide. Dr. Thompson diagnosed depression, not otherwise specified, and opiate dependence in reported full sustained remission. He also assessed right shoulder pain, a two-year history of an inability to work, and a GAF of 50. Dr. Thompson recommended continued outpatient management. He also opined that any one of innumerable medical conditions could be contributing to Plaintiff's difficulties and planned to order tests to screen for various causes of myalgia, fatigue, and low mood that are not classically considered part of primary psychopathology. He continued Plaintiff's medications and recommended that Plaintiff return in one week. (Tr. 408-11)
On January 11, 2008, Dr. Thompson diagnosed depression, opiate dependence in reported full sustained remission, shoulder pain, history of inability to work, and a GAF of 50. Plaintiff's blood work up was normal, and Dr. Thompson found pharmocotherapy to be appropriate. He adjusted Plaintiff's medications and recommended that Plaintiff return in 2 weeks. (Tr. 421-22)
Plaintiff returned to Dr. Thomson on February 13, 2008. Plaintiff reported trying to stop taking Xanax, which had not been successful. Plaintiff was disenchanted with the fact that he had not received Xanax and Ativan through the clinic because those were the only effective medications for his condition. In addition to the previous diagnoses. Dr. Thompson diagnosed BZD Dependence. He noted that Plaintiff was primarily interested in bzd monotherapy, which was not the standard of care for Plaintiff's condition, and he prescribed Bupropion. (Tr. 423-24)
During a follow-up visit with Dr. Thompson on March 12, 2008, Plaintiff reported efficacy with Bupropion, although he continued *857 to take his wife's Xanax against Dr. Thompson's advice. Dr. Thompson increased Plaintiff's Bupropion prescription. (Tr. 426-27) On April 30, 2008, Plaintiff reported being selectively adherent to Bupropion and taking his wife's Alprazolam despite recommendations not to do so. Dr. Thompson noted Plaintiff's numerous anti-depressant trials, which he had not tolerated. Plaintiff refused to undergo psychotherapy. (Tr. 428-29) On June 11, 2008, Plaintiff continued to report numerous anxiety and depressive symptoms. He also continued to take his wife's medication, which was not indicated for depressive symptoms. Plaintiff's GAF was 60. His opiate dependence continued to be in reported full sustained remission. Dr. Thompson noted that Plaintiff continued to resist and be unwilling to entertain efficacious treatments for his depressive symptoms, instead focusing on the lack of effectiveness and side effects of treatment classes other than anxiolytics. Dr. Thompson planned to continue Bupropion and transition Plaintiff to a new physician in July. (Tr. 430-31)
Dr. Armbruster completed a Physical Medical Source Statement on October 13, 2008. She diagnosed Plaintiff with major depression, severe and difficult to treat; probable obstructive sleep apnea; peripheral edema and possible heart disease; hypertension; and shortness of breath, probable COPD. Dr. Armbruster opined that during an 8-hour workday. Plaintiff could sit, stand, and walk for 15 minutes. He could never lift or carry any weight. Further, Plaintiff had manipulative limitations with regard to working with small objects with both hands, as well as limitations in his ability to balance. He could never reach above head or stoop. Dr. Armbruster additionally reported that Plaintiff had osteoarthritis which caused pain, as evidenced by muscle atrophy, reduced range of motion, and motor disruption. Such pain, according to Dr. Armbruster, would preclude focusing on simple tasks during a full-time work schedule. Plaintiff would be absent or late three or more times per month, and he would need to lie down and take more than 3 breaks during a normal workday. She noted that Plaintiff's onset date was March 14, 2006. (Tr. 435-38)

IV. The ALT's Determination
In a decision dated September 16, 2008, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010. He had not engaged in substantial gainful activity since January 16, 2006, his alleged onset date. Further, Plaintiff had the severe combination of impairments which included a remote history of a right rotator cuff injury, depression, substance abuse disorder, and obesity. The ALJ assessed Plaintiff's medical records, noting treatment records, diagnoses, and consultative evaluations. Specifically, the ALJ noted that Dr. Armbruster failed to address or recognize the effects that Plaintiff's opiate addiction may have on his physical and mental limitation in her medical source statement. In addition, the ALJ gave less weight to Dr. Lipsitz' consultative evaluation, as Dr. Lipsitz did not address the impact of Plaintiff's heroin addiction on his mental status. Further, the ALJ noted that Dr. Lipsitz performed the evaluation at the request of Plaintiff's attorney in anticipation of litigation and not in the course of normal treatment. The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P. (Tr. 55-60)
After considering the record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work, except that he was limited to no more than frequent reaching overhead with the right arm and performing simple *858 tasks with no more than occasional contact with the general public and co-workers. The ALJ also noted that he fully considered Plaintiff's obesity. The ALJ found that the evidence in the record failed to support Plaintiff's allegations of a severe and debilitating impairment. Specifically, he noted that the treatment notes indicated troublesome ailments but did not impose limitations that would preclude sustained competitive employment. The ALJ further determined that Plaintiff was unable to perform any past relevant work. However, considering Plaintiff's age classification as a younger individual, his education of at least the high school level, and his RFC, the ALJ found that a number of jobs existed in significant numbers in the national economy which the Plaintiff could perform. The ALJ relied on the VE's testimony to find that Plaintiff could work as a mail clerk, picking table worker, and cleaning worker. Thus, the ALJ concluded that Plaintiff had not been under a disability from January 16, 2006 through the date of the decision. (Tr. 60-62)

V. Legal Standards
A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).
To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.
The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence `is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir.1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir.1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir.1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir.1996).
To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir.1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir.1980).
*859 The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir.1990).
When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[4] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

VI. Discussion
Plaintiff raises several arguments in his brief in support of the complaint. First, Plaintiff contends that the ALJ erred by failing to follow the factors pertaining to weighing medical evidence in rejecting the opinions of the treating physician. Second, Plaintiff argues that the ALJ erred in rejecting Dr. Lipsitz' opinions. Plaintiff additionally asserts that the ALJ erred in failing to include a proper narrative discussion of the rationale in reaching his RFC determination such that the RFC was not supported by substantial evidence. Finally, Plaintiff maintains that the ALJ erred in relying on the VE's determination of the number of jobs by DOT code because the opinion was improper and could not constitute substantial evidence. The Defendant, on the other hand, argues that the ALJ based his RFC assessment on the credible evidence of record and that the ALJ properly relied upon the VE's testimony to determine whether Plaintiff could perform other work existing in significant numbers in the national economy.
The undersigned finds that the ALJ did not give proper weight to Dr. Armbruster and Dr. Lipsitz and thus failed to properly assess Plaintiff's RFC such that substantial evidence does not support the ALJ's determination. The undersigned agrees with Defendant that "if alcohol or drug abuse comprises a contributing factor material to the determination of a disability, the claimant's application must be denied.... 20 C.F.R. § 404.1535." Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir.2003). However, the ALJ must follow the correct procedures for making this determination which includes (1) evaluating whether the plaintiff would still be disabled if he stopped using drugs or alcohol and (2) evaluating which limitations would remain if plaintiff stopped using drugs or alcohol and determining whether the remaining limitations would be disabling.[5]Id. at 693 n. 2. This determination, *860 requires, that the ALJ base the "disability determination on substantial evidence of [plaintiff's] medical limitations without deductions for the assumed effects of substance abuse disorders. The inquiry here concerns strictly symptoms, not causes[.]" Id. at 694. The Plaintiff has the burden of proving that his substance abuse is not a contributing factor material to his alleged disability. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir.2002). "However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding." Brueggemann, 348 F.3d at 693.
Here, the Defendant admits that the ALJ improperly found that Dr. Armbruster and Dr. Lipsitz did not exclude the effects of Plaintiff's drug use. Instead, the record shows that both these doctors noted that his symptoms existed without the influence of drugs. (Tr. 277, 287, 435) While the ALJ did not assess Plaintiff's disability in light of the framework above, the ALJ nonetheless appears to have evaluated Plaintiff's impairments absent his opiate addiction. However, the ALJ's opinion fails to properly credit Plaintiff's treating physician or Dr. Lipsitz, or properly explain why he discounted these opinions such that the case should be remanded to the ALJ for further review.
"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir.2000) (citation omitted). The opinion of a treating physician regarding a plaintiff's impairments will receive controlling weight where "the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Id. (citation omitted). However, a consulting physician's opinion, based upon only one examination of the plaintiff, does not generally represent substantial evidence. Id. (citation omitted). "It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir.2004). But "[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir.2003). The SSA regulations recognize "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the SSA] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(d)(3).
Here, the opinion of Plaintiff's treating physician. Dr. Armbruster, indicated that Plaintiff had severe limitations in his ability to work, including the need to take naps and several breaks throughout the day. (Tr. 277-80) Contrary to the ALJ's determination. Dr. Armbruster assessed the limitations that remained in the absence of drug use. Dr. Armbruster treated Plaintiff on multiple occasions, and her findings were based on objective evidence as well as personal observation.
Dr. Lipsitz' evaluation essentially mirrors Dr. Armbruster's. While Dr. Lipsitz evaluated Plaintiff only once, the ALJ discredited him based on a failure to address the impact of Plaintiff's heroin addition on his mental status and on the fact *861 that the opinions were formulated for litigation purposes and not in the normal course of treatment. However, Defendant acknowledges that Dr. Lipsitz' opinions excluded the effects of Plaintiff's drug use. Further, Plaintiff correctly states that the administrative process with regard to Plaintiff's applications is non-adversarial, and the ALJ's decision to give less weight to Dr. Lipsitz because he was a consultative examiner on behalf of the Plaintiff is error. Nothing in 20 C.F.R. § 404.1527 allows the Social Security Administration to discredit a medical source because the Plaintiff, instead of the administration, sought the consultation. That provision outlines the amount of weight afforded to medical opinions based on the length of treatment and the type of relationship, among other things. In addition, while Defendant goes to great lengths in his Brief to set forth other reasons to discredit Drs. Armbruster and Lipsitz, the undersigned notes that this Court may not reweigh or conduct de novo review of the evidence. Cruze v. Chater, 85 F.3d 1320, 1328 (8th Cir.1996). Instead, this Court's review is limited to determining whether substantial evidence supports the ALJ's determination. Id. at 1320.
Because the ALJ erroneously discredited the opinions of Dr. Armbruster and Dr. Lipsitz, the case should be remanded so that the ALJ may give each opinion proper weight under 20 C.F.R. §§ 404.1527 and 404.1535 or properly discount the opinions as specified in the regulations. In this regard, the ALJ may wish to re-contact these doctors for clarification or additional information.
Likewise, the undersigned finds that the ALJ's RFC assessment is not supported by substantial evidence. Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir.2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A `regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present). The ALJ has the responsibility of determining a claimant's RFC "`based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir.2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995)). "An `RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Sieveking v. Astrue, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D.Mo. Sept. 2, 2008).
Although the ALJ briefly assessed the medical evidence, the ALJ jumped to the conclusion that the Plaintiff was capable of performing light work-related activities involving no more than frequent reaching overhead with the right arm and performing simple tasks which require no more than occasional contact with the public and co-workers. However, the ALJ failed to include a properly supported discussion demonstrating that Plaintiff had the ability to work in an ordinary work setting on a regular and continuing basis, despite these limitations. (Tr. 60-61) The ALJ simply stated that "[i]n sum, the above residual *862 functional capacity assessment is supported by the treatment notes of the claimant's physician's, the claimant's own testimony, and the record as a whole." (Tr. 61) This assessment, however, is void of any reference to specific medical or testimonial evidence demonstrating Plaintiff's ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. Indeed, the ALJ did not even discuss Plaintiff's subjective complaints or his wife's testimony regarding his inability to function on a daily basis, including the inability to get out of bed in the morning and inability to concentrate or remember.
As such, substantial evidence does not support the ALJ's determination that plaintiff can work, where "work" requires an ability to perform on a daily basis in a competitive and stressful work environment. Hutsell v. Massanari, 259 F.3d 707, 713 (8th Cir.2001) (citations omitted); see also SSR 96-8p (RFC is an assessment of an individual's ability to perform sustained work-related activities in a work setting for eight hours a day, five days a week, or the equivalent work schedule).
The undersigned therefore finds that this case should be remanded to the ALJ for further review. On remand, the ALJ should give proper weight to Plaintiff's physicians or properly discount the opinions as specified in the regulations. To the extent that the ALJ relies upon non-examining consultative evaluations, the ALJ should explain his reasoning for giving these opinions greater weight. Further the ALJ should support his assessment of Plaintiff's RFC with references to specific medical and non-medical evidence in the record. Finally, if the ALJ modifies Plaintiff's RFC, he should submit a new hypothetical question to a VE in determining whether Plaintiff is capable of performing work that exists in significant numbers in the national economy.
Accordingly,
IT IS HEREBY RECOMMENDED that this cause be REMANDED to the Commissioner for further proceedings consistent with this Report and Recommendation.
The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).
Feb. 28, 2011.
NOTES
[1] A GAF score of 51 to 60 indicates "moderate symptoms ... OR moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).
[2] A GAF of 41 to 50 indicates "Serious symptoms... OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). A GAF score of 51 to 60 indicates "moderate symptoms ... OR moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.
[3] A GAF of 31 through 40 represents "[s]ome impairment in reality testing or communication... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood...." DSM-IV-TR at 34.
[4] The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984).
[5] The court in Brueggemann sets forth the proper procedure for determining substance abuse related claims. The AU must first determine whether the plaintiff is disabled without deductions for the effects of substance abuse. If the gross total of the plaintiff's limitations shows disability, the ALJ must next consider which limitations would remain when the effects of substance use were absent. Only after determining that the plaintiff is disabled, that drug or alcohol use is a concern, and that substantial evidence shows the remaining limitations in the absence of substance use, may the ALJ determine whether substance use disorders are a contributing factor material to the disability determination. 348 F.3d at 694-95.